

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION # 03CV30298-MAP

JAMES TULGAN,
    Plaintiff

v.

BERKSHIRE ARMORED CAR SERVICES
CO., INC. PROFIT SHARING PLAN,
BERKSHIRE ARMORED CAR SERVICES
CO., INC., GERARD S. REDER and
JACQUELINE POWERS
    Defendants

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON
COUNTERCLAIMS BY
DEFENDANTS

## STATEMENT OF UNCONTROVERTED FACTS

The plaintiff contends the following facts are uncontroverted:

1. The plaintiff noticed the depositions of the defendants Gerard S. Reder, Berkshire Armored Car Services Co., Inc. and Berkshire Armored Car Services Co., Inc. Profit Sharing Plan in connection with this case. (Exhibit 1 to the deposition of Gerard S. Reder).

2. On October 5, 2004, Gerard S. Reder ("Mr. Reder") was deposed in his individual capacity and also as the designated representative of the defendants Berkshire Armored Car Services Co., Inc. ("Corporation") and Berkshire Armored Car Services Co., Inc. Profit Sharing Plan ("Plan"). (Reder deposition, pgs. 7-8).

3. Paragraph 4(a) of the counterclaims of the defendants Mr. Reder and the Corporation allege that Mr. Tulgan misappropriated by fraud or other illegal means property of Berkshire Armored Car Services Co., Inc. by illegal use of its telephone. Paragraph 4(a)

255264-1

18. Mr. Reder was asked whether any of the defendants had any information "besides the information that you have testified here today to support Paragraph 4(b) in the counterclaims" and he answered:

> Well, I can't answer for them. We gave an honest effort to produce as much records as we thought would be necessary to convince you, Mr. Leonard, of at least our integrity. If there's more to be found, I promise you we will eagerly bring it to your attention. (Reder Deposition, pgs. 112-113).

19. Paragraph 4(c) of the counterclaim alleges that Mr. Tulgan "physically assaulted the defendant Jacqueline Powers who at the time was an employee of Berkshire Armored Car Services Co., Inc. thereby causing her injury." (Counterclaims of Defendants, Paragraph 4(c)).

20. When asked what information any of the defendants had to support that allegation, Mr. Reder testified Mr. Tulgan threw a set of keys at Ms. Powers which she dodged. (Reder deposition, pgs. 113-114).

21. Mr. Reder testified he witnessed the event stating:

> I went out after him [Mr. Tulgan} because I feel that women only when you're married to them should be beaten. Scratch that. I don't know why I said that. (Reder deposition, pg. 115).

22. Mr. Reder testified the alleged occurrence happened when Mr. Tulgan was an employee of the Corporation. (Reder deposition, pgs. 114-115).

23. Mr. Reder testified no action was taken against Mr. Tulgan as a result of the alleged occurrence. (Reder deposition, pgs. 115-116).

24. Mrs. Powers never asserted a claim against any of the defendants for the alleged assault by Mr. Tulgan. (Reder deposition, pg. 117).

25. When asked what loss was suffered by the Corporation as a result of the alleged assault on Mrs. Powers, Mr. Reder testified:

> Only that when you're running a business, and I don't know how many employees I had at the time, you don't want dissension among them. You don't want bad feelings. So there is suffering in that now he won't talk to her, she won't talk to him. (Reder deposition, pg. 117)..

26. Paragraph 4(d) of the counterclaims allege that Mr. Tulgan "violated company rules and policies of the defendant Berkshire Armored Car Services Co., Inc. and during and after Tulgan's employment at same thereby injuring the company." (Counterclaims of Defendants, Paragraph 4(d)).

27. When asked what information the defendants had to support that allegation, Mr. Reder testified:

> Well, there are rules that we have printed up. Every employee is familiar with them which declares that fighting during company hours is forbidden. The unwritten rule is that you don't steal and he stole by using the 900 numbers. And he also solicited from one of our vendors a letter falsifying the value of the machinery. The vendor wrote me, I have a copy or I will get a copy if I don't have it from the vendor indicating that Jim – well I was told verbally that Jim had asked him to put a fake price on the value of the equipment right after he left our employment. (Reder deposition, pgs. 118-119).

28. After testifying that Mr. Tulgan solicited a letter from a vendor falsifying the value of machinery, Mr. Reder was asked to more specifically state when that event allegedly occurred. He testified he did not know whether that occurred after Mr. Tulgan left the company entirely, testifying:

> I don't know. I don't know which time frame that he left. Whether he was going over to the Deli Time thing or just left for something else. But he was not in my employ when that was told to me. (Reder deposition, pgs. 121-122).

29. Mr. Reder testified that no loss was suffered by any defendant because of the alleged attempt by Mr. Tulgan to solicit a letter falsifying the value of machinery from a vendor of the Corporation. Mr. Reder testified the vendor reported to him Mr. Tulgan's alleged scheme so no transaction took place based on it. (Reder deposition, pgs. 118-121).

30. Paragraph 6 of the counterclaim of Mr. Reder states:

> In addition to the above, Reder loaned to Tulgan the sum of $15,000 for the purchase of Tulgan's home in Longmeadow, Massachusetts which Tulgan failed to repay. (Counterclaim of Mr. Reder, Paragraph 7).

31. Mr. Reder testified he loaned $15,000 for the down payment on a house in Longmeadow, Massachusetts for Mr. Tulgan and his then wife who is the daughter of Mr. Reder. Mr. Reder could not recall when he did that. (Reder deposition, pg. 123).

32. Mr. Reder was then asked several questions asking for the details of the communications among himself, Mr. Tulgan and his daughter concerning the "loan." The extent of Mr. Reder's assertions regarding the loan are stated in the following questions and answers beginning on page 124 of his deposition:

```
5   Q.  Would you tell us in as much detail as you
6   can how you came to make the loan, the alleged loan
7   to Mr. Tulgan and what was said by all the parties
8   involved?
9   A.  Well, sir, it was a Thursday afternoon.  I
10  don't know.
11  The kids were married and they got a home
12  and I lent them the money.
13  Q.  Well, do you recall any more detail than
14  that?
15  A.  I can recall that Jim never said thank you.
16  Q.  Do you have the check that -- how did you
17  pay the $15,000, by check?
```

18   A.   I'm assuming I did.

19   Q.   Who was the check payable to?

20   A.   I don't know.

21   Q.   Would you tell us as best you can remember

22   what was communicated to Mr. Tulgan and your

23   daughter with regard to this amount of $15,000?

125

1   A.   It's for their house.

2   Q.   So it was for their house. But what, if

3   anything, did you or anyone on your behalf say to

4   express that you were loaning them money?

5   A.   Do I remember distinctly saying to them,

6   Pay me back within six months? No. Shit, there I

7   go again. Here's a father lending his daughter

8   money. I didn't ask her for an interest charge, I

9   didn't ask her for payback, so you win that round.

10   Q.   So would it be -- was it a gift to your

11   daughter, this $15,000, was it intended to be a gift

12   to your daughter from a loving father?

13   A.   I can't characterize it. Let's put it this

14   way; I would not force her into bankruptcy to pay me

15   back. If I need money, will the kids take care of

16   me?

17  Q.  Well, I don't want to press unnecessarily

18  on this point, but you are suing Mr. Tulgan alleging

19  that he owes you $15,000 for this alleged loan. So

20  I'd like to know, if you can, if you have any

21  further memory of what was said with regard to this

22  amount of money that you contend was a loan to Mr.

23  Tulgan?

126

1  A.  I know the thrust of your question because

2  I am over twenty-one. I did not have him sign a

3  note. I did not stipulate an interest. I didn't

4  know Jim very well. If I had known him then I would

5  have said I'll consider it a gift because I know

6  he'll never pay back anything that he owes. Phrase

7  it any way you want.

8  I'm not trying to avoid your question. I

9  think it's an unfair question and you phrased it

10  ufair when you said it as a loving father.

11  Q.  Well, we've now moved on to another

12  question.

13  A.  Good.

14  Q.  No. The question in front of you, and all

15  I'm asking you, Mr. Reder, is to give us your best

16  recollection of what you or anyone on your behalf

7   said to Mr. Tulgan concerning the $15,000?

18  A.  To Mr. Tulgan -- I'm interrupting you but

19  to Mr. Tulgan or to my daughter?

20  Q.  To both, to either on this topic.  If you

21  have given me your best memory?

22  A.  My best memory, it's a period of time when

23  Jim was going to sell the house, Terry and Jim, at a

127

1   profit.  Then they were going to return the loan to

2   me.  That didn't happen.  He took the money and

3   bought or invested in the Deli Time.  While his

4   mother didn't lose any money, I lost mine.  So it

5   Puts a different turn to it.  You know, would I

6   throw my daughter in debtors prison?  No.  Would I

7   throw Jim in a debtors prison?  Yes.  Look, don't

8   get me in a spot with my own attorney.  Ask me a

9   different question.

10  Q.  Do you have any other memory of any

11  communications with Mr. Tulgan and/or your daughter

12  on the issue of the $15,000 you allege you loaned to

13  Mr. Tulgan?

14  A.  No, I have no further recollection.

33. Mr. Tulgan and Mr. Reder's daughter, who was then Mr. Tulgan's wife, sold the home they owned in Longmeadow during 1992. Mr. Reder knew the home was going to be sold and that it was sold during 1992. (Affidavit of James Tulgan, Paragraph 3).

34. Paragraph 7 of the counterclaim of Mr. Reder alleges that Mr. Reder loaned monies to Tulgan for a business venture which Tulgan failed to repay. (Counterclaim of Mr. Reder, Paragraph 7).

35. Mr. Reder was asked to state the facts on which he based the claim that Mr. Tulgan failed to repay him monies for a business venture. Mr. Reder was asked the following questions and provided the following answers:

128

12   So you're alleging that Mr. -- you made a
13   loan to Mr. Tulgan for a business venture which he
14   has failed to repay, is that correct?
15   A. Yes.
16   Q. When did you make this loan to Mr., the
17   alleged loan to Mr. Tulgan?
18   A. It would have been right around the time
19   that he started that Deli Time.
20   Q. What was the business venture that you made
21   the loan for?
22   A. I said Deli Time. And you have to forgive
23   both my age and lack of intelligence, but it was

255264-1

10

129

1  also for Armor Wear. It was a Kevlar vest,

2  bullet-proof vest used for both hunting and

3  protection against bullets. That's been my business

4  since I was a little boy. We used the Kevlar to

5  make a hunting vest, a hunting jacket. And I asked

6  Mr. Tulgan to write a letter to all the police

7  departments in the country announcing that we are

8  this corporation. I lent him the money to buy the

9  brochures and I lent him the money and paid, I'm

10 going to say a tailor but I think that's descriptive

11 enough, to manufacture a token vest. Token is not

12 the word I need. A sample, a model.

13 And he didn't contact any police

14 departments at all, did nothing. And yet had he

15 done that, we all would have been extraordinarily

16 successful because I don't have to tell you how

17 world events made the creation, the manufacturing of

18 bullet-proof vests a very desirable commodity. That

19 money was never repaid.

20 Q. How much did you loan him?

21 A. I have no idea.

22 Q. Well, now --

23   A.   Kevlar is like $50 a square foot. I had a

130

1    couple of rolls of that. The tailor, for want of a

2    better term, I can't think of another term. Plus

3    there were trips to New York to the U.N. that I had

4    paid the bill for. The brochures were relatively

5    expensive. I didn't add them up. It's my daughter.

6    I know it's a redundancy, but sooner or later you

7    have to recognize it. He doesn't.

8    Q.   Mr. Reder, you've alleged in a complaint

9    that you've loaned money to Mr. Reder and you are

10   suing him because he didn't repay you. Are you

11   telling me as you sit here today you don't know how

12   much you lent him?

13   A.   Yes. I am telling you that, but I can go

14   back and find some of those records I think.

15   Q.   Can you tell us the year in which you

16   allege you lent him this money?

17   A.   I don't remember. Time has taken on a

18   different dimension to me. I don't know if it's

19   five years or ten years or two years. It's been a

20   while though. I'm going to guess, I'm going to have

21   to guess at it but it's also possible to get the

22  exact date. Oh, Christ, ten years, eight years,

23  somewhere around eight years I think.

131

1   Q.  Is it your testimony that you lent him the

2   money in connection with a business undertaking

3   called Armor Wear?

4   A.  Yes.

5   Q.  Was Armor Wear a business venture I take

6   it?

7   A.  Yes.

8   Q.  Was there a corporation?

9   A.  I don't know. No, I don't think we

10  incorporated it.

11  Q.  So was this an operating division and

12  operating as a separate division of Berkshire

13  Armored Car Services?

14  A.  No. It was mainly a singular

15  proprietorship meant for Jim and Terry.

16  Q.  Who owned this business, Armor Wear?

17  A.  Jim owned it.

18  Q.  What about your daughter, did she have an

9   interest in it?

20  A.  I don't believe there was a formal

21  documentation of that.

22  Q. Well, did she have any understanding -- did

23  you have any understanding as to whether or not your

                            132

1   daughter had any interest in this business?

2   A. The only interest was as an et ux as a

3   wife.

4   Q. Although you don't remember the amount you

5   say you loaned to Mr. Tulgan, what were the terms of

6   the loan?

7   A. Again, the same scenario as for the house,

8   gave it to them. The bread is cast on the water; if

9   it came back I would have harvested it. It did not

10  come back.

11  Q. As a consequence of that you never got a

12  harvest?

13  A. That's correct.

14  Q. What makes you contend that Mr. Tulgan has

15  some legal duty to repay you whatever amount you

16  gave him with regard to this?

17  A. Why am I to assume that anything that I do

18  for him is a gift?

19  Q. No. We're just talking about this

20  particular allegation that he owes you money as a

21  result of a failed business venture.

22  A. I'm depending on a moral platform, too.

23  Q. Well, if this is a moral claim, please let

133

1   us know that.

2   A. I'm not going to let you off that easy.

3   Q. Tell us what facts there are that lead you

4   to believe that Mr. Tulgan has a legal duty to repay

5   you any money that you advanced to him in connection

6   with this Armor Wear venture?

7   MR. HOUGHTON: I think I'm going to

8   object, but you can answer if you're able to.

9   THE WITNESS: I hate being a money

10  machine and I don't mind giving my children the

11  benefit of what I have earned. There is a sense of

12  principle that is instilled in my blood, in my

13  children, that when they take something, they owe it

14  or a thank you; none of which did I ever get back

15  and you are instigating this lawsuit.

16  MR. HOUGHTON: Just answer the

17  question.

18  THE WITNESS: Okay.

19   MR. HOUGHTON: Don't direct comments to

20   Mr. Leonard.

21   Q. (By Mr. Leonard) Is that the extent of your

22   answer?

23   A. That is the extent of my answer.

134

1   Q. Do you have any other facts that you

2   believe support your claim that Mr. Tulgan has a

3   legal duty to repay you the money you put into this

4   venture?

5   MR. HOUGHTON: Same objection. You can

6   answer it if you're able.

7   THE WITNESS: We'll let the courts

8   decide if it's legal or not. You're asking for an

9   opinion. I'll accept the court's opinion if it's

10   legal or not.

11   Q. (By Mr. Leonard) I'm asking you for any

12  f acts that you know of, that you're aware of that

13   lead you to believe, to lead you to contend that Mr.

14   Tulgan owes you the money you gave him for this

15   venture called Armor Wear?

16   MR. HOUGHTON: Same objection. Go

17   ahead and answer.

18   THE WITNESS: The money that was given

19   to him was requested. I didn't volunteer to give

20   it. At which time he requested it, he promised to

21   pay me back. So I have a verbal or oral commitment

22   to be repaid. I thought it would have been hideous

23   to reduce it to a written form.

135

1    Q. (By Mr. Leonard) What did Mr. Tulgan say to

2    you in that regard?

3    A. In what regard?

4    Q. I think you just said that he said I'll pay

5    you back. Can you tell us your best memory of what

6    was said in connection with that?

7    A. Yes. He said that his mother was going to

8    lend him $10,000 and he was going to use the $10,000

9    if I lent him, and he will return that money to me

10   upon his successful life in that business.

11   Q. So it would be fair to say that Mr. Tulgan

12   said if I'm successful I'll repay you?

13   A. Skip the if.

14   Q. Did you understand that his promise to

15   repay you was predicated upon his future success?

16   A. Yes.

17  Q.  Okay.

18  MR. LEONARD:  I don't have any further

19  questions.  I think we're all set.

20  MR. HOUGHTON:  I don't have any

21  questions.

        The Plaintiff,
        By his Attorney,

        */s/ Robert L. Leonard*
        Robert L. Leonard, Esquire
        Doherty, Wallace, Pillsbury & Murphy, P.C.
        One Monarch Place, Suite 1900
        Springfield, MA  01144-1900
        Tel: (413) 733-3111
        Fax: (413) 734-3910
        B.B.O. Number: 294060

### CERTIFICATE OF SERVICE

I, Robert L. Leonard, Esq., hereby certify that on January 28, 2005, I served a copy of the foregoing on the parties to the case by mailing a copy of same to:

Jack E. Houghton, Jr., Esq.
78 Bartlett Avenue
Pittsfield, MA  01201

        */s/ Robert L. Leonard*
        Robert L. Leonard, Esq.