```
 1            UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
              Civil Action # 03CV30298-MAP
 4
 5
 6
 7   JAMES TULGAN,
           Plaintiff
 8
     vs
 9   BERKSHIRE ARMORED CAR SERVICES CO., INC. PROFIT
     SHARING PLAN, BERKSHIRE ARMORED CAR SERVICES CO.,
10   INC., GERARD S. REDER and JACQUELINE POWERS,
           Defendants
11

12

13

14   DEPOSITION OF: GERARD S. REDER, taken
     before M. Virginia Lanou, Notary
15   Public-Stenographer, pursuant to the
     Massachusetts Rules of Civil Procedure, at
16   the law offices of JACK E. HOUGHTON, JUNIOR, 78
     Bartlett Avenue, Pittsfield, Massachusetts, on
17   October 5, 2004 at 9:50 a.m.

18

19

20
     APPEARANCES:  See second page
21

22
             M. Virginia Lanou
23            Court Reporter
```

```
 1   APPEARANCES:

 2   LAW OFFICES OF JACK E. HOUGHTON, JUNIOR, 78 Bartlett
       Avenue, Pittsfield, Massachusetts, 01201,
 3     representing the Plaintiff
     BY: JACK E. HOUGHTON, JUNIOR, ESQUIRE
 4
     DOHERTY, WALLACE, PILLSBURY & MURPHY, P.C., One
 5     Monarch Place, Suite 1900, Springfield,
       Massachusetts, 01144-1900, representing the
 6     Defendants
     BY: ROBERT L. LEONARD, ESQUIRE
 7

 8
     In Attendance:  Eric Reder
 9
```

```
                   INDEX
     WITNESS                DIRECT    CROSS

     GERARD S. REDER           5


     EXHIBIT     DESCRIPTION             PAGE
     Defense:
     Exhibit 1, Notices of taking deposition........  7
     Exhibit 2, Document response...................  22
     Exhibit 3, Profit sharing plan.................  22
     Exhibit 4, Participant statement...............  25
     Exhibit 5, 10/26/00 Letter.....................  30
     Exhibit 6, Copy of check.......................  38
     Exhibit 7, Copy of check, front and back.......  46
     Exhibit 8, 9/15/02 letter......................  52
     Exhibit 9, 10/8/02 letter......................  56
     Exhibit 10, 10/21/02 letter....................  57
     Exhibit 11, 10/29/02 letter....................  77
     Exhibit 12, 10/30/02 letter....................  77
     Exhibit 13, 1/6/03 letter......................  82
     Exhibit 14, 1/7/03 letter......................  82
     Exhibit 15, 4/9/03 letter......................  82
     Exhibit 16, 4/22/03 letter.....................  82
     Exhibit 17, Thirteen pages.....................  104
```

```
              STIPULATIONS


         It is agreed by and between the parties

    that all objections, except objections as to the

    form of the questions, are reserved, to be raised at

    the time of trial for the first time.


         It is further agreed by and between the

    parties that all motions to strike unresponsive

    answers are also reserved, to be raised at the time

    of trial for the first time.


         It is also agreed that the deponent will

    read and sign the deposition.


         It is further agreed by and between the

    parties that notification to all parties of the

    receipt of the original deposition transcript is

    also hereby waived.
```

**Page 5**

1  GERARD S. REDER, Deponent, having been
2  first duly sworn, deposes and says as follows:
3        DIRECT EXAMINATION BY MR. LEONARD
4        MR. LEONARD: Usual stipulations?
5        MR. HOUGHTON: He would like to read
6  and sign.
7        MR. LEONARD: I expect there are going
8  to be documents marked. Can we agree that I will
9  keep the originals and then provide you a copy?
10        MR. HOUGHTON: Yes.
11        MR. LEONARD: You're in agreement with
12  that?
13        MR. HOUGHTON: Yes.
14        MR. LEONARD: Now as I see, there's
15  another person in the room here. I believe your
16  name is Mr. Reder, too?
17        MR. ERIC REDER: That's correct.
18        MR. HOUGHTON: That's Mr. Reder's son.
19        MR. LEONARD: Under what authority is
20  Mr. Reder's son here?
21        MR. HOUGHTON: Under what authority?
22        MR. LEONARD: Why is he here?
23        MR. HOUGHTON: He would like to be here

**Page 6**

1  with his father. He is a principal in the company.
2  He is the president of Berkshire Armored Car. He's
3  been instructed not to say anything or do anything.
4        MR. LEONARD: Well, he was not an
5  employee of any of the defendants?
6        MR. HOUGHTON: Yes, he is.
7        MR. LEONARD: What defendant?
8        MR. HOUGHTON: Berkshire Armored Car
9  Services, Inc.
10        MR. LEONARD: What is his position with
11  Berkshire Armored Car?
12        MR. HOUGHTON: President.
13        MR. LEONARD: He's currently the
14  president of the organization?
15        MR. HOUGHTON: Yes.
16        MR. LEONARD: Is he the designated
17  representative of that organization?
18        MR. HOUGHTON: No. You asked me ahead
19  of time who that was and I designated Mr. Gerard
20  Reder.
21        MR. LEONARD: Let me just talk to my
22  client about the presence of Mr. Reder.
23        MR. HOUGHTON: Yes. He's been

**Page 7**

1  instructed not to say anything or do anything.
2        MR. ERIC REDER: I want to watch out
3  for my father's health, too.
4        (Discussion held off record.)
5        MR. LEONARD: On the representation
6  that Mr. Reder is the president of one of the
7  defendants, I will not object to his presence.
8        MR. HOUGHTON: Thank you very much.
9        MR. LEONARD: I'm sure he knows that he
10  has no right to actively participate in this in any
11  fashion.
12        MR. HOUGHTON: He does.
13        MR. LEONARD: I'm going to have that
14  marked as Exhibit 1. This is the letter about the
15  notices of deposition.
16        MR. HOUGHTON: You're going to
17  introduce this as an exhibit?
18        MR. LEONARD: Yes.
19           (Plaintiff's Exhibit 1,
20            offered and marked.)
21        MR. LEONARD: Now I'm going to show
22  you, Mr. Houghton, what has been marked Exhibit 1,
23  which is the notices of deposition I sent out and

**Page 8**

1  for which we're here today.
2        What I'd like to have you do is, if you
3  would, I noticed the deposition of Gerard Reder
4  individually, the deposition of Berkshire Armored
5  Car Services Company, Inc. Profit Sharing Plan,
6  Berkshire Armored Car Services Company, Inc. and
7  also the deposition of Jacqueline Powers.
8        Disregarding the notice of the
9  deposition of Jacqueline Powers it's my
10  understanding that Mr. Reder is the person
11  designated under the rules.
12        MR. HOUGHTON: Gerard Reder.
13        MR. LEONARD: Gerard. To speak for the
14  legal entities that I noticed in deposition, the
15  Profit Sharing Plan and the corporation. Mr. Reder,
16  am I correct in my understanding?
17        MR. HOUGHTON: It's agreed.
18        MR. LEONARD: So we don't have to
19  duplicate all of these, it's common sense, are we
20  agreed that Mr. Reder, when he's answering these
21  questions, is speaking on behalf of himself
22  individually and as a representative of the Profit
23  Sharing Plan and the corporation?

## 85

```
12:14:22  1        MR. HOUGHTON: Yes.
12:14:22  2        MR. LEONARD: But I don't see the
12:14:24  3   follow-up letter.
12:14:28  4        MR. HOUGHTON: This one?
12:14:28  5        MR. LEONARD: This one here, 2003.
12:14:32  6        MR. HOUGHTON: Yes.
12:14:34  7        MR. LEONARD: I don't see any documents
12:14:36  8   responding to this letter.
12:14:38  9        MR. HOUGHTON: Do you agree that you
12:14:40 10   sent this letter?
12:14:40 11        THE WITNESS: Yes, I agree I sent the
12:14:42 12   letter.
12:14:44 13        MR. HOUGHTON: So I'll stipulate that
12:14:46 14   this is his letter in response to that letter of
12:14:50 15   April 9, 2003.
12:14:52 16        MR. LEONARD: All I want to do, Mr.
12:14:52 17   Reder says I don't remember if I sent any documents
12:14:56 18   with it. I don't believe we got any documents and I
12:14:58 19   don't see any documents in your document response
12:15:00 20   that indicate that they came with Exhibit 16.
12:15:06 21        So if there are any in the document
         22   response --
12:15:12 23        MR. HOUGHTON: I'll produce them. If
```

## 86

```
12:15:12  1   there are any, I'll produce them. If not, I'll say
12:15:18  2   it. That's the April 22 letter, right?
12:15:20  3        MR. LEONARD: April 22 which is
12:15:20  4   Exhibit 16, April 22, 2003 letter.
12:15:40  5        I'm just going to consult with my
12:15:42  6   client for a minute.
12:17:34  7            (A recess was taken.)
12:17:40  8     Q.  (By Mr. Leonard) I'm now going to ask
12:17:40  9   questions about the various counterclaims, Mr
12:19:04 10   Reder.
12:19:06 11        I think there was -- as the representative
12:19:14 12   or the spokesperson for the defendant Berkshire
12:19:20 13   Armored Car Services, Inc. in this matter do you
12:19:24 14   understand that counterclaims have been filed
12:19:26 15   against Mr. Tulgan in this lawsuit?
12:19:28 16     A.  Yes.
12:19:32 17     Q.  The first counterclaim that I see is that
12:19:36 18   in paragraph 4-A of the counterclaim of -- let's go
12:19:46 19   to the company. In paragraph 4-A of the
12:20:02 20   counterclaim filed by Berkshire Armored Car
12:20:06 21   Services, Inc. it alleges that Mr. Tulgan,
12:20:14 22   "Misappropriated by fraud or other legal means
12:20:18 23   property of Berkshire Profit Sharing Plan by illegal
```

## 87

```
12:20:24  1   use of its telephone."
12:20:28  2        Do you understand that is a counterclaim?
12:20:30  3     A.  Yes.
12:20:34  4        MR. LEONARD: Off the record.
         5            (Discussion held off record.)
12:21:32  6        MR. LEONARD: On the record.
12:21:36  7     Q.  (By Mr. Leonard) Well, as the
12:21:38  8   spokesperson, as the representative of the legal
12:21:40  9   entities plus in your individual capacity, is there
12:21:48 10   -- do any of the defendants allege that Mr. Tulgan
12:21:54 11   misappropriated property of any of the defendants by
12:21:56 12   illegal use of its telephone?
12:22:00 13     A.  You're asking if I'm claiming that? Yes,
12:22:04 14   for illegal use of the phone.
12:22:06 15     Q.  Now does that go -- do the defendants claim
12:22:12 16   that Mr. Tulgan illegally used the phone of more
12:22:18 17   than one of the defendants or just Berkshire Armored
12:22:22 18   Car Services or the Profit Sharing Plan?
12:22:26 19     A.  If you use it from Berkshire Armored you're
12:22:30 20   also using it from the pension plan because the
12:22:34 21   pension plan is based on compensation. If a
12:22:38 22   compensation is false, that's giving false
12:22:42 23   information to Berkshire and the Profit Sharing
```

## 88

```
12:22:46  1   Plan.
12:22:46  2     Q.  Okay. Would you tell us what facts led you
12:22:52  3   and the other defendants to allege that Mr. Tulgan
12:22:56  4   misappropriated assets of the defendant by illegal
12:23:00  5   use of its telephone?
12:23:02  6     A.  When Mr. Tulgan was alone in our terminal
12:23:06  7   there were 900 numbers dialed on it. There were 900
12:23:14  8   numbers dialed from his parents house and there were
12:23:16  9   900 numbers dialed from my daughter's house.
12:23:26 10     Q.  Was this while Mr. Tulgan was employed by
12:23:30 11   Berkshire Armored Car Services?
12:23:32 12     A.  Yes, it was. I don't know before or after
12:23:34 13   but while he was employed by me.
12:23:38 14     Q.  Were any calls -- do you have any
12:23:42 15   information that Mr. Tulgan made any unauthorized
12:23:48 16   calls, pay calls after he was, after his employment
12:23:56 17   ended with Berkshire Armored Car Services?
12:23:58 18     A.  You're asking me if he made any calls
12:24:00 19   charged to Berkshire Armored after he stopped
12:24:04 20   employment with us? Is that your question? I
12:24:08 21   paraphrased it.
12:24:08 22     Q.  Yes.
12:24:10 23     A.  I am unaware of it.
```

## Page 89

Q. So are all the claims you're saying, you meaning any of the defendants, for calls that Mr. Tulgan allegedly made while he was still an employee of Berkshire Armored Car Service?

A. Oh, boy. Convoluted but, yes, say it again.

Q. I'm trying to -- I'll tell you where I'm trying to go and I hope you understand it.

A. Do you want me to understand it?

Q. No. I prefer you did not. I'm trying to determine whether there is any claim made by any of the defendants for telephone charges allegedly incurred by Mr. Tulgan after his employment ended with Berkshire Armored Car Services?

A. No.

Q. When did Mr. Tulgan's employment end with Berkshire Armored Car Services?

A. I'm not sure of the exact date.

Q. If I suggested 1997, would that refresh your recollection?

A. I would not dispute it without access to my own records.

Q. What information do you have that Mr.

## Page 90

Tulgan made telephone calls to 900 numbers that were charged to any of the defendants?

A. The phone bills that came from the terminal that he was working in.

Q. Now I have -- let me go back here -- I have Exhibit Number 2 to your deposition here which is our document request. And in document request number seven I asked for, on behalf of Mr. Tulgan, "All documents concerning the allegations in paragraph 4-A of your counterclaim." And this was addressed to all the defendants.

Now the response was, Documents supplied.

MR. LEONARD: Now just for the record to save time here can you, Mr. Houghton, tell me which documents in the document response from this morning are referred to for request seven?

MR. HOUGHTON: Which documents are referred to? There's a header that says response to request number seven. So in other words -- here is my header, this is the response to number seven.

MR. LEONARD: Let me see if I can find it. Can I just see it? Off the record.

(Discussion held off record.)

## Page 91

MR. LEONARD: On the record.

Jack, just can we agree that the plaintiff requested in request number seven of his document request to all the defendants, "All documents concerning the allegations in paragraph 4-A of your counterclaim."

MR. HOUGHTON: Well, it says what it says. I'm not -- frankly, I'm reluctant to stipulate to -- I don't know where you're going with this. I mean it's an exhibit and why don't you ask Mr. Reder, but I'm reluctant to stipulate to that. It says what it says.

Q. (By Mr. Leonard) I'm going to, Mr. Reder, I'm going to again show you what has been marked Exhibit 2 that I asked you about before. It's the document request, the defendants' response to the plaintiff's document request and ask you to go over to I believe it's request seven.

A. I read it.

Q. That's asked for any documents concerning paragraph 4-A of the counterclaim, does it not?

A. Yes.

Q. The response says in effect, See response

## Page 92

number seven in the document response.

A. Okay.

Q. I'm going to show you a copy of one of the counterclaims here because I think they all track.

MR. HOUGHTON: Do you want him to look at 4-A?

MR. LEONARD: Yes. I have it open here.

Q. (By Mr. Leonard) Would you take a look at 4-A of the counterclaims from the various defendants?

A. Yes.

Q. Do you agree that 4-A, it alleges that Mr. Tulgan defrauded the defendants by making phone calls for which the defendants were charged?

A. Yes.

Q. What I'm going to ask you is, you have in front of you response number seven in the defendants, plural, document response. Would you point out to me any documents in that that relate to -- that in any way show that Mr. Tulgan charged phone calls inappropriately or illegally to any of the defendants. You have a document you are

97

12:41:36  1  that he should not have?
12:41:40  2      A.  I don't see them in here and I am still
12:42:04  3  looking.
12:42:04  4      Q.  Take your time.
12:42:30  5      A.  No, I don't see any phone bills.  I don't
12:42:32  6  see anything else.
12:42:50  7      Q.  Should I continue or do you want to look
12:42:52  8  some more?
12:43:02  9      A.  Okay.  You may continue.
12:43:04 10      Q.  Thank you.  In paragraph 4-B of the
12:43:10 11  counterclaim of each of the defendants it alleges
12:43:14 12  that Mr. Tulgan, "Misappropriated by fraud or other
12:43:20 13  illegal means property of the defendant Berkshire
12:43:26 14  Armored Car Services, Inc., and of the Berkshire
12:43:40 15  Armored Car Services Profit Sharing Plan by
12:43:44 16  submitting invoices for payment to the plaintiff by
12:43:48 17  the defendants which were knowingly and
12:43:52 18  intentionally overstated by the plaintiff resulting
12:43:54 19  in significant loss to Berkshire Armored Car
12:43:58 20  Services, Inc.."
12:44:00 21          Now as the representative of both yourself
12:44:04 22  individually and two of the defendants, what
12:44:08 23  information do you have or are you aware of that

98

12:44:12  1  supports that allegation?
12:44:16  2      A.  He would submit a weekly report of the
12:44:18  3  amount of production that he claimed to, allegedly
12:44:22  4  had claimed to produce, and he was paid on that
12:44:26  5  basis.
12:44:30  6      Q.  This would be while he was an employee of
12:44:32  7  Berkshire Armored Car Services?
12:44:34  8      A.  That's correct.
12:44:46  9      Q.  Take one step back.  When did any of the
12:44:50 10  defendants, this is with regard to the alleged
12:44:54 11  inappropriate telephone calls, when did the
12:44:58 12  defendants find out that Mr. Tulgan had made these
12:45:06 13  illegal telephone calls?
12:45:08 14      A.  When meaning the date?
12:45:10 15      Q.  Either the date --
12:45:14 16      A.  I don't have a date but in reviewing our
12:45:16 17  phone bills we saw a whole bunch 900 number calls.
12:45:20 18  While I'm familiar now that these are pornographic
12:45:24 19  sites, I didn't know then.  But apparently one of
12:45:26 20  our people did and pointed it out to us that someone
12:45:28 21  is making pornographic calls and they're very
12:45:32 22  expensive.  So we started an investigation and
12:45:34 23  noticed some of these calls were when Jim was the

99

12:45:38  1  only one in the terminal.
12:45:46  2      Q.  When did that happen, when did you receive
12:45:50  3  that information?
12:45:52  4      A.  I don't recall.
12:45:52  5      Q.  Did you receive the phone bills which
12:45:56  6  allegedly contain the inappropriate calls within a
12:46:00  7  month after the phone calls were made?
12:46:02  8      A.  I don't know when the discovery was made
12:46:06  9  from the phone bill.  But obviously that's where we
12:46:10 10  found it.
12:46:14 11      Q.  Do you recall the employee who called it to
12:46:16 12  your attention?
12:46:18 13      A.  I really don't.  I don't know.
12:46:26 14      Q.  How did you, how did the defendants -- what
12:46:30 15  information did any of the defendants have that tied
12:46:32 16  Mr. Tulgan or indicated that Mr. Tulgan was the one
12:46:38 17  who made those calls?
12:46:38 18      A.  I say again, he was the only one in the
12:46:42 19  terminal when the calls were made.
12:46:46 20      Q.  So this is a terminal that Berkshire
12:46:48 21  Armored Car Services --
12:46:48 22      A.  Meaning an office, yes.
12:46:54 23          MR. HOUGHTON:  Where?

100

12:46:56  1          THE WITNESS:  West Springfield.
12:46:56  2      Q.  (By Mr. Leonard)  They were made through a
12:46:58  3  number in West Springfield?
12:47:00  4      A.  Yes.
12:47:00  5      Q.  Now moving to "B" here which is the
12:47:08  6  misappropriation that I just asked you about.  You
12:47:12  7  said that Mr. Tulgan submitted production reports
12:47:16  8  that were inaccurate, and his pay was based on
12:47:22  9  those?
12:47:22 10      A.  They were fake.  Inaccurate was your word.
12:47:26 11      Q.  You're right.  Would you tell us as best --
12:47:34 12  well, would you tell us what fake reports Mr. Tulgan
12:47:38 13  submitted and when he did it?
12:47:44 14      A.  When he was submitting his weekly request
12:47:50 15  or weekly report on what he allegedly wrapped -- we
12:47:56 16  call the term wrapped -- loose coin in buckets that
12:48:00 17  go into rolls.
12:48:06 18      Q.  Can you give me a fuller explanation of
12:48:10 19  that?
12:48:10 20      A.  Yes.  He would give us a report.  He was
12:48:14 21  paid on the basis of so much per wrap and he had
12:48:18 22  personnel working for him, for us, and he would
12:48:22 23  submit a weekly report on how much he had wrapped

## 101

1  and then his pay would be based on that.
2  Q. Was it a straight kind of commission basis
3  or production basis or was it -- did the salary go
4  up and down?
5  A. It was a mixture but I don't recall. But
6  it was so much pennies or percent of pennies and I
7  don't recall per wrap.
8  Q. Were these reports allegedly false or fake
9  reports that he submitted, to use your word, were
10 those submitted while he was an employee of the
11 company?
12 A. Yes.
13 Q. Over how long a period do the defendants
14 contend he submitted fake reports?
15 A. I don't know. I'm going to guess months.
16 Q. I'm going to show you again the document
17 response which is Exhibit Number 2 and here I'll
18 show you one of the complaints show that the
19 counterclaim paragraph asserts that you say that he
20 submitted fake reports, is 4-B. Do you see that?
21 A. Yes, I do.
22 Q. I'm going to show you the document
23 response, the document production of documents

## 102

1  response which is plaintiff's Exhibit Number 2 and
2  direct your attention to request number eight that
3  reads, I'm just going to hold it. It requests al
4  documents concerning the allegations in paragraph
5  4-B of your counterclaim.
6     The response is, see document request
7  number seven. Do you agree? You can take a look at
8  that if you want.
9  A. Yes.
10 Q. You have in front of you document request
11 number seven, do you not?
12 A. Yes.
13 Q. Do you have document request number seven
14 in front of you?
15 A. The response, yes.
16 Q. Would you by reference to document request
17 number seven identify for us what documents support
18 any of the defendants' allegations that Mr. Tulgan
19 submitted fake reports thereby receiving money that
20 he should not have?
21 A. I think these are part of them. I think
22 these are the reports that he submitted. I think
23 these are the reports.

## 103

1  Q. Okay.
2     MR. LEONARD: I don't want you to do
3  this without Jack's agreement. Can we separate out
4  the documents that Mr. Reder believes support
5  allegation 4-B.
6     MR. HOUGHTON: Yes.
7     MR. LEONARD: Do you want to do that?
8     MR. HOUGHTON: Sure.
9     THE WITNESS: May I be excused for a
10 moment?
11    MR. LEONARD: Absolutely.
12    (A lunch recess was taken.)
13    MR. LEONARD: On the record.
14 Q. (By Mr. Leonard) Having come back from the
15 lunch break, Mr. Reder, do you now realize that
16 anything that you said earlier today during the
17 deposition was incorrect in any respect?
18 A. I haven't had a chance to review either in
19 my head or in writing what I said, so I would rather
20 withhold giving you an answer on that.
21 Q. I think when we broke I had asked that the
22 documents that the defendants contend show that Mr.
23 Tulgan allegedly by fraud or other illegal means

## 104

1  obtained the property of any of the defendants, I
2  asked you to cull out those documents. These are
3  them? Okay.
4     MR. LEONARD: Jack, I was going to mark
5  these as a group. Do you want to write on the
6  bottom sequential numbers?
7     MR. HOUGHTON: Yes.
8     MR. LEONARD: So we know what we're
9  talking about.
10    (Plaintiff's Exhibit 17,
11    offered and marked.)
12 Q. (By Mr. Leonard) Exhibit 17 consists of
13 thirteen pages. Do you have Exhibit 17 in front of
14 you?
15 A. I do, sir.
16 Q. Are those the documents contained in the
17 document response that the defendants contend
18 evidence or in any way show that Mr. Tulgan
19 misappropriated money of one or more of the
20 defendants?
21 A. Yes.
22 Q. Can we go through those -- off the record.
23    (Discussion held off record.)

### Page 105

```
 1          MR. LEONARD: On the record.
 2      Q.  (By Mr. Leonard) You have in front of you
 3  Exhibit 17, correct?
 4      A.  Yes.
 5      Q.  Can we agree it's thirteen pages?
 6          MR. HOUGHTON: Yes.
 7      Q.  (By Mr. Leonard)  These are documents that
 8  came out of the defendants', that's plural, document
 9  response and these are the documents that the
10  defendants contend evidence or in some way show that
11  Mr. Tulgan misappropriated property of one or more
12  of the defendants, is that correct?
13      A.  Yes.
14      Q.  Would you explain to us how -- what in
15  these documents show that, if you can, by reference
16  to the page number in the lower left?
17      A.  Well, starting with page two -- I'm going
18  to skip page one because these are not in my hand,
19  my handwriting, I didn't do them, but we will
20  contend that on page two has done 500 in a day I
21  proposed paying him twelve and a half cents a box or
22  one two five.  Both Ken and Roger are matching or
23  beating my quota expectations and I am happy with
```

### Page 106

```
 1  both. I feel that piece of work should increase
 2  their production even more.  And our records revea
 3  that they were not doing 500 a day.
 4      Q.  Where are those records?
 5      A.  I'm going through them now.  Page three is
 6  a firm called Silver, Cushon and Myers which is an
 7  independent CPA firm which we hired to do some
 8  auditing.  And in January 1, '91 to September 30,
 9  '91 we show that we paid $153,000 and overpaid him
10  on that number by $8,465.
11      Q.  Excuse me.  How do you -- what do you mean
12  by -- what does this mean by overpaid?  Can you
13  explain that to me?
14      A.  Yes.  The input of the salary of $52,000
15  did not match, plus the other $28,000 for the other
16  men, did not match our sales which meant that it was
17  overstated.
18      Q.  Well, before you leave this --
19      A.  I didn't leave it.
20      Q.  Okay.  Does this mean that in effect for
21  that period of time that this operation, the
22  Springfield coin room, lost approximately $8,465?
23      A.  Where are you getting that from?
```

### Page 107

```
 1      Q.  From the line amount you say overpaid.
 2      A.  $8,465 we overpaid him.  He did $8,400 less
 3  in work.  So if we calculate what we actually sold
 4  and the inventory that is left, then we paid him
 5  $8400 too much during the January 1 to September 30.
 6      Q.  But even if you paid him more than you were
 7  making --
 8      A.  I didn't say that.
 9      Q.  Okay.
10      A.  I don't know what our profit was on this.
11      Q.  How does this support the allegation that
12  Mr. Tulgan defrauded one or more of the defendants?
13      A.  Because he's put in for salary of $52,118
14  which is overstated by $8,465.
15      Q.  Well, if someone has paid a salary, that's
16  for whatever work is done, correct?  I guess I
17  shouldn't ask you that.
18          Who determined Mr. Tulgan's salary as
19  reported here?
20      A.  A CPA firm.
21      Q.  Who determined what Mr. Tulgan's salary
22  would be?
23      A.  He did.
```

### Page 108

```
 1      Q.  So he gave himself -- were you his boss at
 2  that time?
 3      A.  Did he answer to me directly?  No.  Well,
 4  on the other hand he might have.  I was at that
 5  time, probably '91 I was a president of the company.
 6      Q.  Did you or did someone on behalf of
 7  Berkshire Armored Car Services tell Mr. Tulgan to
 8  set his own salary?
 9      A.  No. I set, I believe he and I together set
10  a formula for that salary based on the amount of his
11  production.
12      Q.  So his production, are you saying that his
13  production did not live up to what you expected
14      A.  No.  I'll use my own phrasing and you can
15  do what you want with it.  He reported to us a
16  production level that would have produced a $52,000
17  salary and that was overstated.
18      Q.  Okay.  Going on, any other documents?
19      A.  Box, paper.  By the way, this is a way that
20  more of an expert in this calculation can show that
21  the production was overstated because it shows the
22  number of boxes and the number of rolls that can be
23  extrapolated out by someone with a little bit more
```

### 109

14:05:56  1   detail on it, which produced an overstatement of
14:06:02  2   production.
14:06:02  3       Q.  By the way, I notice in the two documents
14:06:06  4   you refer to, Mr. Reder, that they refer back to
14:06:08  5   inventory or events in 1991, is that correct?
14:06:18  6       A.  Yes.
14:06:20  7       Q.  So these events occurred back in 1991 or
14:06:24  8   thereabouts?
14:06:24  9       A.  Yes.
14:06:26 10       Q.  Did you receive these documents or did your
14:06:28 11   company receive these documents back around 1991?
14:06:32 12       A.  I presume so, yes.  It would have to be
14:06:36 13   prior to that a wee bit more for the CPA to be able
14:06:42 14   to come up with that.
14:06:44 15       Q.  What other documents?
14:06:44 16       A.  Is this Jim's, can I ask if that's Jim's?
14:06:48 17       Q.  No, you can't.
14:06:50 18           MR. HOUGHTON:  No, you can't.  Just
14:06:52 19   keep going.
14:06:54 20           THE WITNESS:  Again, we have for 1990
14:06:56 21   payroll coin rolling, Jim FICA, workers comp, amount
14:07:04 22   overpaid, $7,900.
14:07:08 23       Q.  (By Mr. Leonard) This is number five, page

### 110

14:07:10  1   five of that exhibit?
14:07:12  2       A.  Yes, it is.
14:07:12  3       Q.  Okay.
14:07:18  4       A.  Same thing with six.
14:07:22  5       Q.  Do you recognize that handwriting by the
14:07:24  6   way?
14:07:26  7       A.  Six is an inventory, kind of straight and
14:07:34  8   simple.
14:07:34  9       Q.  But my question is --
14:07:36 10       A.  Do I recognize the handwriting?  No.
14:07:38 11       Q.  Yes.
14:07:40 12       A.  No.  It's definitely not mine.  '91 is one
14:07:48 13   of the sheets that will demonstrate how the
14:07:52 14   shortages or how the overcharging is determined
14:07:56 15   because this is, I mentioned earlier that we can
14:08:02 16   determine in hindsight by where we have sold rolled
14:08:08 17   coin, so we always know how much we have actually
14:08:10 18   produced and sold.  You'll see that there's a
14:08:14 19   federal reserve in here, FRBB, Federal Reserve Bank
14:08:18 20   of Boston and Maine Armored speaks for itself.  I
14:08:28 21   don't do the bookkeeping.  I'm sure you recognize
14:08:32 22   that by now.
14:08:32 23           I couldn't lead you through the steps of

### 111

14:08:36  1   the determination but others can.
14:08:38  2           On page eight is again a summary.  This
14:08:44  3   summary also is done by our CPA and it shows an
14:08:50  4   overpayment of $16,377 in overstated earning.  It
14:09:02  5   looks like it was running seven, $8,000 a year.  And
14:09:08  6   the end of '91 came up to $16,000 and a total of
14:09:14  7   $19,000 finally.
14:09:18  8           On page nine it's a bookkeeping indication
14:09:34  9   of the falsified production and it will take someone
14:09:44 10   else to tell you.
14:09:48 11       Q.  Mr. Reder, does this all refer back to
14:09:50 12   events that happened in 1990 and 1991?
14:09:52 13       A.  These particular ones appear to.
14:09:58 14       Q.  I think I've had sufficient explanation of
14:10:00 15   these.  Thank you.
14:10:02 16       A.  You are welcome.
14:10:06 17       Q.  Are there any other documents in the
14:10:14 18   document response that the defendants contend
14:10:18 19   support the allegations in paragraph 4-B of the
14:10:22 20   various defendants' counterclaim stating that in
14:10:30 21   effect Mr. Tulgan misappropriated money by knowingly
14:10:34 22   and intentionally overstating information?
14:10:38 23           MR. HOUGHTON:  Can I just say that once

### 112

14:10:40  1   again the defendant intends to supplement its
14:10:42  2   response and from the records that I described
14:10:44  3   earlier there may very well be records there to
14:10:50  4   support that.
14:10:52  5       Q.  (By Mr. Leonard) When did Mr. -- at some
14:10:56  6   point did Mr. Tulgan get out of the coin wrapping
14:11:00  7   business or coin wrapping portion of the operation?
14:11:04  8       A.  At one point he left our employ to open a
14:11:08  9   restaurant or a delicatessen called Deli Time.  So
14:11:14 10   he left our employ during that period.  I think he
14:11:18 11   came back, but I'm not sure.  I know he filed
14:11:26 12   bankruptcy and I know that Deli Time went down the
14:11:30 13   tube.  I don't know if he came back to work for me
14:11:32 14   or not.  I can't remember.
14:11:34 15           There was a time that he left our employ, a
14:11:38 16   couple of times I think, or maybe more than a couple
14:11:42 17   of times he left our employ.
14:11:44 18       Q.  Do any of the defendants have any other
14:11:46 19   information besides the information that you have
14:11:52 20   testified here today to support paragraph 4-B in the
14:11:56 21   counterclaims?
14:11:56 22       A.  Well, I can't answer for them.  We gave an
14:12:02 23   honest effort to produce as much records as we

Case 3:03-cv-30298-MAP Document 30-3 Filed 01/28/2005 Page 9 of 14
Case Compress Deposition of GERARD S. REDER, taken October 5, 2004
Sheet 29

**113**

1 thought would be necessary to convince you, Mr.
2 Leonard, of at least our integrity. If there's more
3 to be found, I promise you we will eagerly bring it
4 to your attention.
5     Q. Let me turn your attention to paragraph 4-C
6 of the counterclaim of each of the defendants. That
7 alleges in paragraph 4-C of the counterclaim that
8 Mr. Tulgan physically assaulted the defendant
9 Jacqueline Powers who at the time was an employee of
10 Berkshire Armored Car Services, Inc. thereby causing
11 her injury.
12     As the representative, the designated
13 representative of the two legal defendant legal
14 entities and yourself, what information do you have
15 that support this allegation?
16     A. My office was right next to hers and
17 between our offices was patio doors that normally
18 function outside but we had them to separate our
19 offices so we could have verbal privacy.
20     I was sitting there. Jim and Jackie got
21 into a shouting match. Jim has a horrible temper
22 that he can't control. When the words started
23 flowing I naturally paid attention. Jim took a

**114**

1 bundle of keys. Our keys are forty to fifty keys on
2 a ring and he threw it at her. Jackie is a skinny
3 little thing, but relatively athletic. She dodged
4 it.
5     I immediately jumped up and called Jim
6 back. Jim immediately went downstairs and left the
7 building and I decided I better not chase after him.
8 It scared the hell out of Jackie. He's got a
9 vicious temper against women.
10     Q. So --
11     A. And she was shaking like a leaf after that.
12 A bundle of keys, visualize them, fifty of them
13 being thrown by a grown man at a skinny little girl.
14     Q. When did this happen?
15     A. I don't know.
16     Q. Can you give me a year?
17     A. No. I can't give you a decade. I don't
18 remember the date. It can be -- presumably I car
19 get you somewhere in the time period by looking at
20 her employment records.
21     Q. Did this occurrence happen when Mr. Tulgan
22 was an employee of Berkshire Armored Car?
23     A. Yes. Although I think he left shortly

**115**

1 after that or something like that.
2     Q. And Miss Powers was an employee of
3 Berkshire Armored Car at the time?
4     A. Yes, she was.
5     Q. Is this the same Miss Powers who was a
6 trustee of the Profit Sharing Plan?
7     A. Yes.
8     Q. Did she leave the employment of Berkshire
9 Armored Car before Mr. Tulgan?
10     A. I don't know. I don't think so. I only
11 have to guess at that, so I can't give you a
12 specific answer without looking at the personnel
13 files.
14     Q. Do you, Mr. Reder, claim to have witnessed
15 Mr. Tulgan throwing the keys in the direction of
16 Miss Powers?
17     A. I not only witnessed it; I went out after
18 him because I feel that women only when you're
19 married to them should be beaten. Scratch that. I
20 don't know why I said that.
21     Seriously he threw the keys at her and I
22 went right after him.
23     Q. Was any action taken as a result of that

**116**

1 occurrence?
2     A. No. I rationalized to myself that I can't
3 do this to my daughter or my son-in-law meaning
4 disciplinary action or knocking him on his ass. So
5 I opted to let it go and I sat with Jackie and
6 calmed her down and she recognized that I'm
7 protecting my daughter and son-in-law. So she
8 agreed not to press charges. She was rattled.
9     Q. Did she ever file or did she ever incur any
10 medical expenses --
11     A. Not as her --
12     Q. -- to your knowledge of any of the
13 defendants or as a result of this alleged accident?
14     A. Did she file -- you have to say it again,
15 please.
16     Q. Yes. Are any of the defendants aware of
17 any claims made against any of the defendants by
18 Miss Powers for this alleged --
19     A. Claimed against the defendant?
20     Q. Yes. Any of the defendants in this action.
21     A. Did she make a claim against the
22 defendants?
23     Q. Yes.

**117**

1  A. Isn't that ourselves?
2  Q. Yes. Let me try to put it --
3  A. He's not a defendant.
4  Q. I know that. Yes, I know that.
5  A. I'm sure you do.
6  Q. What I'm asking you is did Mrs. Powers ever
7  assert a claim against you or Berkshire Armored Car
8  or the Profit Sharing Plan as a result of the
9  alleged assault by Mr. Tulgan?
10 A. No.
11 Q. Did Mrs. Powers -- what was the loss
12 suffered, if any, by Berkshire Armored Car as a
13 result of this alleged assault on Mrs. Powers?
14 A. Only that when you're running a business,
15 and I don't know how many employees I had at the
16 time, you don't want dissention among them. You
17 don't want bad feelings. So there is a suffering in
18 that now he won't talk to her, she won't talk to
19 him.
20    Her mother was employed by me. She went to
21 her mother complaining about it. I kept it tapped
22 down, not covered up, but I put people at ease. The
23 keys did miss her, but scared the hell out of her.

**118**

1  That's all.
2  Q. Let's move here to the counterclaim,
3  paragraph four, actually paragraph six -- no. I'm
4  sorry, I skipped one here. Let me go to paragraph
5  4-D of the counterclaim.
6    Paragraph 4-D of the counterclaim alleges
7  that Mr. Tulgan, "violated company rules and
8  policies of the defendant Berkshire Armored Car
9  Services Co., Inc. during and after Tulgan's
10 employment at same thereby injuring the company."
11    Would you tell us what information any of
12 the defendants have, defendants plural, have to
13 support that allegation?
14 A. Well, there are rules that we have printed
15 up. Every employee is familiar with them which
16 declares that fighting during company hours is
17 forbidden. The unwritten rule is you don't steal
18 and he stole by using the 900 numbers. And he also
19 solicited from one of our vendors a letter
20 falsifying the value of the machinery. The vendor
21 wrote me, I have a copy or I will get a copy if I
22 don't have it, from the vendor indicating that Jim
23 -- well, I was told verbally that Jim had asked him

**119**

1  to put a fake price on the value of the equipment
2  right after he left our employment.
3    So that complies with that paragraph in my
4  opinion.
5  Q. Do you have the letter, the false letter
6  from the vendor?
7  A. I will get it if I don't have it.
8  Q. From that am I to assume that it is not
9  among the documents produced here today?
10 A. I don't know whether it is or not.
11 Q. Let's do this; I'm going to take you back
12 to the document response again which is Exhibit
13 Number 2 and particularly request number ten which
14 says produce all documents.
15 A. Yes.
16 Q. So that request number ten asks for all
17 documents concerning the allegations in paragraph
18 4-D of your counterclaim and the response says see
19 documents to response request number seven. Do you
20 agree with that?
21 A. Yes.
22 Q. And you have in front of you, do you not,
23 document response number seven?

**120**

1  A. No.
2    MR. HOUGHTON: Right there.
3    THE WITNESS: Okay, now I have it in
4  front of me.
5  Q. (By Mr. Leonard) Can we agree that you have
6  document response number seven in front of you?
7  A. Uh-huh.
8  Q. Can you please identify for us any
9  documents in that document response that evidence or
10 support in any way the allegations in paragraph 4-D
11 of the counterclaims?
12 A. As a result of this meeting and sitting
13 here in the room I recall the incident where a man
14 by the name of Dick Straight, who was a vendor that
15 sold me the coin wrapping machine, tried to sell me
16 another one. And in the process of selling me
17 another machine he denigrated the value of the
18 machines that were going to be traded which were the
19 ones that Tulgan worked on.
20    And he said that Tulgan told him to give
21 him a letter indicating, and I cannot recall the
22 amounts of money that Jim told him the machines were
23 worth. But the bottom line was instead of the

**121**

multiple thousands James claimed to the value, it was far less. And in fact he showed me a letter, so I will go back to him inasmuch as I just remembered his name saying it out loud, so that it will be in the record that the guy's name is Dick Straight.

Q. Straight?
A. Like in a straight line.
Q. S-t-r-a-i-g-h-t?
A. I think so, yes. He's in Worcester, somewhere in that area.
Q. When did this occur?
A. Sometime after Jim left. And that is an unethical and improper thing to do. I leave it to the lawyers to know if it's illegal. But certainly unethical and improper.
Q. What loss, if any, was suffered as a result by the defendants?
A. Of that letter?
Q. Well, of this Mr. Tulgan's alleged --
A. Not a loss. Only an expressed motive. It didn't cause me a loss.
Q. This was after Mr. Tulgan --
A. Left.

**122**

Q. -- left your company entirely?
A. I don't know. I don't know which time frame that he left. Whether he was going over to the Deli Time thing or just left for something else. But he was not in my employ when that was told to me.
Q. At some point did Berkshire Armored Car get out of the coin wrapping business?
A. Yes.
Q. When was that?
A. I don't know. Well, I have to qualify that. Wrapping ourselves, we got out of wrapping ourselves and started to sub it out to a distant relationship with another vendor.
Q. Okay. Let's then go to paragraph six of the counterclaim and I believe this is in all the counterclaims that says that, "In addition to above Reder loaned to Tulgan the sum of $15,000 for the purchase of Tulgan's home in Longmeadow, Mass, which Tulgan failed to repay."
Did I read that correctly?
A. Yes. I guess. I don't have it in front of me.

**123**

Q. Here. Let me give you a copy.
A. Number?
   MR. HOUGHTON: Right there.
   THE WITNESS: Yes.
Q. (By Mr. Leonard) When do you say that you loaned $15,000 to Mr. Tulgan?
A. For the down payment of the house in Longmeadow.
Q. When was that?
A. I can look it up but I can't tell you now. I don't remember.
Q. Was it in the -- was it when he was in the coin wrapping business or around that time?
A. I don't know if we would specify just the coin wrapping because he was working for me before he was married and after he was married. So I don't know the time frame. It's researchable if you insist.
Q. Well, if you're going to make the allegation --
A. It's not an allegation. That's the truth.
Q. Well, it's an allegation when it's in the complaint. Let me put it that way.

**124**

So far as you know did your daughter and son-in-law and Mr. Tulgan only own one house in Longmeadow?
A. Longmeadow, yes, they only owned one.
Q. Would you tell us in as much detail as you can how you came to make the loan, the alleged loan to Mr. Tulgan and what was said by all the parties involved?
A. Well, sir, it was a Thursday afternoon. I don't know.
   The kids were married and they got a home and I lent them the money.
Q. Well, do you recall any more detail than that?
A. I can recall that Jim never said thank you.
Q. Do you have the check that -- how did you pay the $15,000, by check?
A. I'm assuming I did.
Q. Who was the check payable to?
A. I don't know.
Q. Would you tell us as best you can remember what was communicated to Mr. Tulgan and your daughter with regard to this amount of $15,000?

125

14:28:52  1   A.  It's for their house.
14:28:54  2   Q.  So it was for their house. But what, if
14:28:58  3   anything, did you or anyone on your behalf say to
14:29:02  4   express that you were loaning them money?
14:29:12  5   A.  Do I remember distinctly saying to them,
14:29:16  6   Pay me back within six months? No. Shit, there I
14:29:22  7   go again. Here's a father lending his daughter
14:29:24  8   money. I didn't ask her for an interest charge, I
14:29:30  9   didn't ask her for payback, so you win that round.
14:29:34 10   Q.  So would it be -- was it a gift to your
14:29:38 11   daughter, this $15,000, was it intended to be a gift
14:29:42 12   to your daughter from a loving father?
14:30:10 13   A.  I can't characterize it. Let's put it this
14:30:14 14   way; I would not force her into bankruptcy to pay me
14:30:20 15   back. If I need money, will the kids take care of
14:30:24 16   me?
14:30:26 17   Q.  Well, I don't want to press unnecessarily
14:30:30 18   on this point, but you are suing Mr. Tulgan alleging
14:30:34 19   that he owes you $15,000 for this alleged loan. So
14:30:40 20   I'd like to know, if you can, if you have any
14:30:44 21   further memory of what was said with regard to this
14:30:50 22   amount of money that you contend was a loan to Mr.
14:30:56 23   Tulgan?

126

14:30:56  1   A.  I know the thrust of your question because
14:31:00  2   I am over twenty-one. I did not have him sign a
14:31:06  3   note. I did not stipulate an interest. I didn't
14:31:10  4   know Jim very well. If I had known him then I would
14:31:16  5   have said I'll consider it a gift because I know
14:31:20  6   he'll never pay back anything that he owes. Phrase
14:31:22  7   it any way you want.
14:31:24  8       I'm not trying to avoid your question. I
14:31:26  9   think it's an unfair question and you phrased it
14:31:30 10   unfair when you said it as a loving father.
14:31:36 11   Q.  Well, we've now moved on to another
14:31:40 12   question.
14:31:40 13   A.  Good.
14:31:42 14   Q.  No. The question in front of you, and all
14:31:44 15   I'm asking you, Mr. Reder, is to give us your best
14:31:50 16   recollection of what you or anyone on your behalf
14:31:52 17   said to Mr. Tulgan concerning the $15,000?
14:32:02 18   A.  To Mr. Tulgan -- I'm interrupting you but
14:32:04 19   to Mr. Tulgan or to my daughter?
14:32:06 20   Q.  To both, to either on this topic. If you
14:32:16 21   have given me your best memory?
14:32:18 22   A.  My best memory, it's a period of time when
14:32:22 23   Jim was going to sell the house, Terry and Jim, at a

127

14:32:26  1   profit. Then they were going to return the loan to
14:32:32  2   me. That didn't happen. He took the money and
14:32:34  3   bought or invested in the Deli Time. While his
14:32:42  4   mother didn't lose any money, I lost mine. So it
14:32:46  5   puts a different turn to it. You know, would I
14:32:48  6   throw my daughter in debtors prison? No. Would I
14:32:52  7   throw Jim in a debtors prison? Yes. Look, don't
14:32:58  8   get me in a spot with my own attorney. Ask me a
14:33:02  9   different question.
14:33:04 10   Q.  Do you have any other memory of any
14:33:08 11   communications with Mr. Tulgan and/or your daughter
14:33:12 12   on the issue of the $15,000 you allege you loaned to
14:33:18 13   Mr. Tulgan?
14:33:26 14   A.  No, I have no further recollection.
14:33:30 15   Q.  Let's, if we can, move to allegations
14:33:36 16   contained in -- we finished here. Can I have that
14:33:40 17   back again?
14:33:42 18   A.  Sure.
14:33:46 19   Q.  Allegations in paragraph seven of the
14:33:50 20   counterclaims which reads, "Reder also loaned monies
14:33:56 21   to Tulgan for business venture which Tulgan failed
14:34:00 22   to repay."
14:34:02 23       Did I read that correctly? I'll give you a

128

14:34:06  1   copy of the complaint. It's number seven.
14:34:24  2   A.  Go ahead.
14:34:24  3   Q.  Did I read that correctly; is that an
14:34:26  4   allegation that you're making?
14:34:28  5   A.  Yes.
14:34:30  6   Q.  And the other defendants are making?
14:34:34  7   A.  I made this allegation.
14:34:36  8   Q.  Okay.
14:35:00  9   A.  It says Reder there.
14:35:02 10   Q.  I know. But I want to make sure none of
14:35:04 11   the other -- okay.
14:35:08 12       So you're alleging that Mr. -- you made a
14:35:10 13   loan to Mr. Tulgan for a business venture which he
14:35:14 14   has failed to repay, is that correct?
14:35:18 15   A.  Yes.
14:35:20 16   Q.  When did you make this loan to Mr., the
14:35:22 17   alleged loan to Mr. Tulgan?
14:35:26 18   A.  It would have been right around the time
14:35:26 19   that he started that Deli Time.
14:35:30 20   Q.  What was the business venture that you made
14:35:32 21   the loan for?
14:35:36 22   A.  I said Deli Time. And you have to forgive
14:35:42 23   both my age and lack of intelligence, but it was

## 129

also for Armor Wear. It was a Kevlar vest, bullet-proof vest used for both hunting and protection against bullets. That's been my business since I was a little boy. We used the Kevlar to make a hunting vest, a hunting jacket. And I asked Mr. Tulgan to write a letter to all the police departments in the country announcing that we are this corporation. I lent him the money to buy the brochures and I lent him the money and paid, I'm going to say a tailor but I think that's descriptive enough, to manufacture a token vest. Token is not the word I need. A sample, a model.

And he didn't contact any police departments at all, did nothing. And yet had he done that, we all would have been extraordinarily successful because I don't have to tell you how world events made the creation, the manufacturing of bullet-proof vests a very desirable commodity. That money was never repaid.

Q. How much did you loan him?
A. I have no idea.
Q. Well, now --
A. Kevlar is like $50 a square foot. I had a

## 130

couple of rolls of that. The tailor, for want of a better term, I can't think of another term. Plus there were trips to New York to the U.N. that I had paid the bill for. The brochures were relatively expensive. I didn't add them up. It's my daughter. I know it's a redundancy, but sooner or later you have to recognize it. He doesn't.

Q. Mr. Reder, you've alleged in a complaint that you've loaned money to Mr. Reder and you are suing him because he didn't repay you. Are you telling me as you sit here today you don't know how much you lent him?

A. Yes. I am telling you that, but I can go back and find some of those records I think.

Q. Can you tell us the year in which you allege you lent him this money?

A. I don't remember. Time has taken on a different dimension to me. I don't know if it's five years or ten years or two years. It's been a while though. I'm going to guess, I'm going to have to guess at it but it's also possible to get the exact date. Oh, Christ, ten years, eight years, somewhere around eight years I think.

## 131

Q. Is it your testimony that you lent him the money in connection with a business undertaking called Armor Wear?
A. Yes.
Q. Was Armor Wear a business venture I take it?
A. Yes.
Q. Was there a corporation?
A. I don't know. No, I don't think we incorporated it.
Q. So was this an operating division and operating as a separate division of Berkshire Armored Car Services?
A. No. It was mainly a singular proprietorship meant for Jim and Terry.
Q. Who owned this business, Armor Wear?
A. Jim owned it.
Q. What about your daughter, did she have an interest in it?
A. I don't believe there was a formal documentation of that.
Q. Well, did she have any understanding -- did you have any understanding as to whether or not your

## 132

daughter had any interest in this business?
A. The only interest was as an et ux is a wife.
Q. Although you don't remember the amount you say you loaned to Mr. Tulgan, what were the terms of the loan?
A. Again, the same scenario as for the house, gave it to them. The bread is cast on the water; if it came back I would have harvested it. It did not come back.
Q. As a consequence of that you never got a harvest?
A. That's correct.
Q. What makes you contend that Mr. Tulgan has some legal duty to repay you whatever amount you gave him with regard to this?
A. Why am I to assume that anything that I do for him is a gift?
Q. No. We're just talking about this particular allegation that he owes you money as a result of a failed business venture.
A. I'm depending on a moral platform, too.
Q. Well, if this is a moral claim, please let

### Page 133

```
14:41:40  1  us know that.
14:41:40  2      A.  I'm not going to let you off that easy.
14:41:46  3      Q.  Tell us what facts there are that lead you
14:41:48  4  to believe that Mr. Tulgan has a legal duty to repay
14:41:54  5  you any money that you advanced to him in connection
14:41:56  6  with this Armor Wear venture?
14:41:58  7          MR. HOUGHTON:  I think I'm going to
14:42:00  8  object, but you can answer if you're able to.
14:42:02  9          THE WITNESS:  I hate being a money
14:42:04 10  machine and I don't mind giving my children the
14:42:08 11  benefit of what I have earned.  There is a sense of
14:42:14 12  principle that is instilled in my blood, in my
14:42:18 13  children, that when they take something, they owe it
14:42:22 14  or a thank you; none of which did I ever get back
14:42:26 15  and you are instigating this lawsuit.
14:42:32 16          MR. HOUGHTON:  Just answer the
14:42:34 17  question.
14:42:34 18          THE WITNESS:  Okay.
14:42:36 19          MR. HOUGHTON:  Don't direct comments to
14:42:40 20  Mr. Leonard.
14:42:42 21      Q.  (By Mr. Leonard) Is that the extent of your
14:42:42 22  answer?
14:42:42 23      A.  That is the extent of my answer.
```

### Page 134

```
14:42:42  1      Q.  Do you have any other facts that you
14:42:46  2  believe support your claim that Mr. Tulgan has a
14:42:48  3  legal duty to repay you the money you put into his
14:42:52  4  venture?
14:42:52  5          MR. HOUGHTON:  Same objection.  You can
14:42:54  6  answer it if you're able.
14:42:56  7          THE WITNESS:  We'll let the courts
14:42:58  8  decide if it's legal or not.  You're asking for an
14:43:00  9  opinion.  I'll accept the court's opinion if it's
14:43:04 10  legal or not.
14:43:06 11      Q.  (By Mr. Leonard) I'm asking you for any
14:43:08 12  facts that you know of, that you're aware of that
14:43:10 13  lead you to believe, to lead you to contend that Mr.
14:43:14 14  Tulgan owes you the money you gave him for this
14:43:20 15  venture called Armor Wear?
14:43:22 16          MR. HOUGHTON:  Same objection.  Go
14:43:22 17  ahead and answer.
14:43:24 18          THE WITNESS:  The money that was given
14:43:26 19  to him was requested.  I didn't volunteer to give
14:43:28 20  it.  At which time he requested it, he promised to
14:43:32 21  pay me back.  So I have a verbal or oral commitment
14:43:36 22  to be repaid.  I thought it would have been hideous
14:43:40 23  to reduce it to a written form.
```

### Page 135

```
14:43:44  1      Q.  (By Mr. Leonard) What did Mr. Tulgan say to
14:43:44  2  you in that regard?
14:43:46  3      A.  In what regard?
14:43:46  4      Q.  I think you just said that he said I'll pay
14:43:50  5  you back.  Can you tell us your best memory of what
14:43:54  6  was said in connection with that?
14:43:56  7      A.  Yes.  He said that his mother was going to
14:44:00  8  lend him $10,000 and he was going to use the $10,000
14:44:04  9  if I lent him, and he will return that money to me
14:44:12 10  upon his successful life in that business.
14:44:20 11      Q.  So it would be fair to say that Mr. Tulgan
14:44:26 12  said if I'm successful I'll repay you?
14:44:30 13      A.  Skip the if.
14:44:32 14      Q.  Did you understand that his promise to
14:44:32 15  repay you was predicated upon his future success?
14:44:40 16      A.  Yes.
14:44:42 17      Q.  Okay.
14:44:44 18          MR. LEONARD:  I don't have any further
14:44:46 19  questions.  I think we're all set.
14:44:52 20          MR. HOUGHTON:  I don't have any
14:44:52 21  questions.
14:44:54 22          (Witness excused.)
         23          (Deposition concluded.)
```

### Page 136

```
 1          SIGNATURE PAGE- ERRATA SHEET
 2  (To be signed by deponent and returned to counsel
 3  within thirty days)
 4  I, the undersigned, GERARD S. REDER, do hereby
    certify that I have read the foregoing transcript of
 5  my testimony given in the matter of JAMES TULGAN
    versus BERKSHIRE ARMORED CAR SERVICES CO., INC.
 6  PROFIT SHARING PLAN, BERKSHIRE ARMORED CAR SERVICES
    CO., INC., GERARD S. REDER and JACQUELINE POWERS,
 7  taken on October 5, 2004, and that to the best of my
    knowledge, said transcript is true and accurate,
 8  with the exception of the following corrections
    listed below:
 9  PAGE    LINE    CORRECTION
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  DATE_____
20
21
22          GERARD S. REDER
23  mvl
```